IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

ISREAL MILLS,

                Plaintiff,

v.                                          CIVIL ACTION NO.  5:08-cv-00260

EAST GULF COAL PREPARATION
COMPANY, LLC, et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed Defendants' Motion for Summary Judgement [Docket 93]. In this motion, Defendants are seeking judgment on Plaintiff's claims under the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301 *et seq.* ("USERRA"), Plaintiff's claim that Defendants violated a substantial West Virginia public policy and Plaintiff's emotional distress claim. For the reasons stated below, Defendants' motion is denied in part, and granted in part.

*I. BACKGROUND AND FACTS*

This civil action was filed on April 17, 2008. Plaintiff, a former employee of Defendants, alleges that due to his service in the West Virginia National Guard, he was laid off and not rehired in contravention of USERRA and West Virginia public policy. He also alleges the intentional infliction of emotional distress ("IIED") on the part of Defendants.

Plaintiff was hired by Defendants as an at-will employee on February 3, 2006. While he was hired as an electrician, he also began working as a thermal dryer operator and maintenance worker shortly after his employment had commenced.

Plaintiff testified at his deposition that he had originally been scheduled to have October 30, 2006 off from work. On October 29th, Plaintiff informed co-workers that he would be signing up for the National Guard on October 30th. However, Plaintiff agreed to a request by one of his supervisors, Frank Sanger, that he come to work on the 30th, with the caveat that Plaintiff would need to leave early in order to attend his appointment at the National Guard offices. The next day, when Plaintiff informed a different supervisor, Terry Clay, that he would be leaving early, Clay, according to Plaintiff, "heehawed . . . and hollered" at the news (Docket 103, ex. 3, at 104). When Plaintiff arrived at work the following day, October 31st, the superintendent, Barry O'Bryan, informed Plaintiff that he was not to miss any more days or leave early, even if it involved the National Guard, and also expressed concern about Plaintiff's job performance. Defendants, however, recall this October 31st conversation somewhat differently. They state that O'Bryan's conversation with Plaintiff only addressed the latter's poor job performance, work ethic, attitude, and attendance.

At his deposition, Plaintiff reported the following conversation with Terry Clay prior to his enlistment in his National Guard:

> Terry Clay mentioned a couple times that it was probably not a good idea, he said I'll end up back in Iraq. And, you know, I asked him, I said, well, there's nothing anybody can do about it, I mean, it'd be my decision. He said, well, we'll just have to replace you if that happens. I said, well, they have to hold my job when I get – until I get back. He just looked at me and walked on. We talked about it a couple of times . . . I know [Clay] was prior Army and I asked him about, you know, what he thought and that's what his thoughts was on it.

(Docket 103, ex. 3 at 64-65). Plaintiff further testified that Clay told him prior to his enlistment that "I will have to replace you because you will not be around," *id.* at 141, and, after Plaintiff had enlisted, Clay told Plaintiff that he was "liable to have to go away for a long time." *Id.* at 119. While discussing the war in Iraq, Plaintiff also states that Clay told him "you really need to be here, but you had to go join the Guard." *Id.* at 140. Plaintiff testified that following his enlistment, O'Bryan wouldn't speak with him, Clay distanced himself, and that both "left [him] out of the loop." *Id.* at 137.

On November 14, 2006, Plaintiff broke his arm in a non-work related automotive accident. According to the internal policies of Defendants, light work was unavailable to Plaintiff as he had not been injured on the job. Plaintiff accordingly took unpaid medical leave with the permission of Defendants, and returned to work on or about January 21, 2007. When Plaintiff returned, his job title had been changed to thermal dryer operator. However, he received no cut in pay. Plaintiff reported that upon his return, he gave his National Guard schedule to Barry O'Bryan, who "looked at it and shook his head and put it in his pocket and walked off." (Docket 103, ex. 3 at 125-26). Plaintiff's drill dates were then placed on a big calendar in the office for all to see. *Id.* at 117. Plaintiff also stated at his deposition that, two or three months prior, Clay told him that Frank Sanger had a "big issue" with Plaintiff joining the military, though Clay did not go into further detail. (Docket 103, ex. 3 at 176-77).

Defendants state that, in the spring of 2007, a decline in the coal industry necessitated cuts in production and costs. At Plaintiff's workplace, it was resolved to reduce the number of shifts from three to two, and to lay off two employees. Defendants state that O'Bryan "reviewed the Prep Plant staffing and determined there were one more thermal dryer operator and one more mobile

3

equipment operator than needed . . . . O'Bryan then compared the individuals in those positions in light of length of service, work performance, quality of work, and the needs of the company and decided to lay off Mills and mobile equipment operator Chad Simmons . . . . When Mills was laid off, a termination form was completed based on consultation between O'Bryan and Ashley, and the form reflected O'Bryan's assessment of Mills' performance as poor and that Mills was not recommended for re-hire." (Docket 94 at 6). In August 2007, Plaintiff responded to a newspaper advertisement for a Prep Plant electrician position at Defendant Pocahontas Coal. Defendants state that Plaintiff's application was reviewed by the human resources manager, Richard Ashley, who consulted with Prep Plant Superintendent Richard Bailey. According to Defendants, "Bailey was familiar with Mills' employment history and performance at the Prep Plant and Mills' poor electrician skills[1] . . . . Bailey recommended to Ashley that Mills not be interviewed . . . . Consequently, no action was taken on Mills' employment application." (Docket 94 at 7-8).

## II. STANDARD OF REVIEW AND APPLICABLE LAW

*A. Summary Judgement*

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56©. In considering a motion for summary judgment, the Court will not "weigh the

---

[1] Specifically, Defendants state that "[o]n one occasion, Bailey was called to the Prep Plant by Mills' foreman, Sangar, because Mills made a mistake while doing electrical troubleshooting and almost caused an accident, i.e. Mills used a 600-volt rated meter to test 4,000 volts and the meter blew up and melted. Bailey was also told by Sangar, and former Prep Plant Superintendent Paul McBride, that Mills missed a lot of work, did not show a lot of enthusiasm for his job, and did not blend in with the rest of the crew. Chief Electrician Clay also told Bailey about Mills' poor job performance while working for Clay and Clay's conclusion that Mills did not have the skills necessary to do electrical jobs. Sanger also told Bailey that Mills was unable to grasp the details of his job as a thermal dryer operator." (Docket 94 at 7-8) (internal citations omitted).

evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). However, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor . . . . [and] must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

*B. USERRA*

USERRA "prohibit[s] discriminatory actions where the employee's military status is a '*motivating factor*' in the decision, even if the employee's military status is not the sole factor in the decision . . . . If the employee establishes that his military status was a motivating factor in the employer's decision, USERRA then shifts the burden of proof to the employer, allowing the employer to avoid liability only if "the employer can prove that the action would have been taken in the absence of" the employee's military status." *Hill v. Michelin North America, Inc.* 252 F.3d 307, 312 (4th Cir. 2001) (emphasis added).

In USERRA cases, "circumstantial evidence will often be a factor in these cases, for discrimination is seldom open or notorious. Discriminatory motivation . . . may be reasonably inferred from a variety of factors, including proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses." *Sheehan v. Department of Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001). Proximity in time is not an exclusive

test, and there is no reason for a Court to limit itself to looking only at the proximity of the adverse employment action to military activity. *Velazquez-Garcia v. Horizon Lines Of Puerto Rico, Inc.*, 473 F.3d 11, 19 (1st Cir. 2007). Further, while allegations of military discrimination alone are not sufficient, deposition testimony from a plaintiff presenting specific instances of anti-military remarks and complaints and pressure from superiors allow a case to survive summary judgment. The jury, and not a judge, should determine the credibility of the non-moving party in such instances. *Id.* at 17-18. *C. West Virginia Public Policy*

"The rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge." Syllabus, *Harless v. First National Bank in Fairmont*, 162 W.Va. 116 (1978). The West Virginia Supreme Court of Appeals has recognized a substantial public policy prohibiting the termination of an employee in retaliation for exercising his rights to the predecessor of USERRA, the Veterans' Reemployment Act. *Mace v. Charleston Area Medical Center Foundation, Inc.*, 188 W. Va. 57, 63-65 (1992).

*D. Intentional Infliction of Emotional Distress*

West Virginia recognizes the tort of IIED. "In order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional

distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it." Syllabus Point 3, *Travis v. Alcon Laboratories, Inc.*, 202 W. Va. 369 (1998).

### III. ARGUMENT

A. USERRA

Defendants make multiple arguments as to why summary judgment should be granted on Plaintiff's USERRA claim. First, Defendants argue that Plaintiff cannot show that they took any adverse employment action based on Plaintiff's National Guard affiliation. They argue that O'Bryan's actions were inconsistent with animosity towards Plaintiff's National Guard service, as Plaintiff met his Guard obligations without interference; Defendants let Plaintiff take medical leave despite having no obligation to do so; and Plaintiff's wage was not reduced when his job classification was changed. Defendants similarly argue that there is no evidence that the decision not to interview Plaintiff for the August 2007 electrician vacancy was motivated by Plaintiff's National Guard status, as the decision was based on Plaintiff's work record prior to his being laid off.

As Plaintiff formally joined the National Guard on November 1, 2006, was laid off on April 17, 2007, and not interviewed in August 2007, Defendants further argue that there is no temporal relationship between Plaintiff's enlistment and what they argue are the sole adverse employment actions of laying Plaintiff off and then not interviewing him. Defendants argue that Plaintiff's October 31, 2006, conversation with O'Bryan was not an adverse employment action, as Plaintiff suffered no change in employment status as a result of the meeting, and because the topic of the meeting was Plaintiff's job performance.

Defendants further argue that there is no inconsistency between the proffered reason for Plaintiff's layoff and the decision not to interview him, and Defendants' other actions of cutting shifts, laying off an additional employee, and basing the layoffs on length of employment, work performance, work quality, and the needs of Defendants. Similarly, Defendants claim that there is no inconsistency between the decision not to interview Plaintiff and Defendants' other actions, as the decision not to interview Plaintiff was based on his record. Moreover, Defendants argue that there is no evidence of any hostility towards Plaintiff's National Guard service, nor any evidence of disparate treatment of employees involved with the military and other similarity situated employees

Plaintiff disagrees with these assertions in his Resonse [*sic*]. First, citing to Clay's and O'Bryan's various conversations with, and conduct towards, Plaintiff, Plaintiff argues that Defendants' demonstrated bias against him is due to his military service. Plaintiff further argues that the October 31, 2006, conversation that he had with O'Bryan regarding his performance constituted an adverse employment action, as that meeting with O'Bryan "reverberated throughout the rest of the Plaintiff's relationship with the Defendants. When Plaintiff later applied to get his old job back, the Defendant relied upon this disciplinary action as a rationale for not rehiring him." (Docket 103 at 7-8).

Plaintiff also contests Defendants' assertion that he would have been laid off regardless of his National Guard status. Plaintiff argues that, by structuring the layoff decision making process in the way that they did, Defendants ensured that Plaintiff would be selected due to his job as a dryer operator and his lack of seniority. Plaintiff argues that, had Defendants considered the entire pool of employees, an objective decision would have favored Plaintiff. Regarding the decision not to interview him, Plaintiff argues that Bailey's decision not to interview him was rooted in his

conversations with Clay and O'Bryan and Plaintiff's October 31st meeting with O'Bryan. Given this and Bailey's knowledge of Plaintiff's National Guard membership, Plaintiff argues that "[i]t would be impossible to remove this taint from Bailey's decision not to interview the Plaintiff. (Docket 103 at 14).

In their reply,[2] Defendants first argue that the statements allegedly made by Clay to Plaintiff are too ambiguous to reflect any discriminatory animus, and could be construed as Clay's opinions about Plaintiff enlisting in the Guard during a time of war. According to Defendants, any attempts to divine Clay's intent would be speculative, and, therefore, his statements cannot be construed as anti-military animus. Defendants further argue that Plaintiff relies upon self-serving, unsubstantiated statements about his perception of how he was treated. They argue that Plaintiff's assertions that O'Bryan wouldn't speak with him, that Clay distanced himself, and that both left Plaintiff out of the loop are insufficient to prevent summary judgment. They also argue that Plaintiff provides no support for the proposition that being "left out of the loop" is discriminatory or an adverse employment action. *B. West Virginia Public Policy*

Defendants argue that Plaintiff's claim that they acted in violation of substantial West Virginia Public Policy is duplicative of his USERRA claim, and should therefore be dismissed. Defendants primarily rely upon *Guevara v. K-Mart Corp.*, 629 F. Supp. 1189 (S.D. W. Va. 1986) (Haden, C.J.), in making this argument.

---

[2] Defendants also argue in their reply that Plaintiff relies upon inadmissable unauthenticated documents in many instances. However, the Court declines comment on this issue, as the Court finds that the documents in question—which Defendants provided to Plaintiff—are not necessary to resolve summary judgment. Accordingly, the Court will not address the arguments made by both parties that rely on these documents.

9

In Guevara, the plaintiff alleged that she had been constructively discharged from K-Mart due to the national origin of her husband. Rather than state a claim under the West Virginia Human Rights Act, W. Va. Code Section 5-11-1 et seq., ("WVHRA") the plaintiff brought a *Harless*-type action under common law arguing that her constructive discharge was in violation of a substantial West Virginia public policy. Chief Judge Haden found that the WVHRA preceded the *Harless* decision, and that the statute expressly provided a remedy that did not previously exist. He "conclu[ded] that a *Harless*-type action may not be substituted for an action under the West Virginia Human Rights Act." *Guevara*, 629 F. Supp. at 1191-92. Defendants conclude that "[b]ecause the public policy against discharging an employee due to his affiliation with the National Guard, arguably articulated in *Mace*, is based on the VRRA, no common law right against such discharge existed prior to the passage of the USERRA predecessor statute . . . . Mills' public policy claim is subject to the same analysis as the discrimination claim at issue in *Guevara*: Mills' exclusive remedy for Defendants' alleged discrimination on the basis of his military affiliation is under USERRA and he cannot pursue a distinct public policy claim." (Docket 94 at 19-20).

Plaintiff disagrees in his response. He argues that unlike the statute and common law cause of action at issue in *Guevara*, USERRA and West Virginia common law provide different remedies. While USERRA only allows for back pay and, if a plaintiff can show that an employer acted wilfully, liquidated damages, under West Virginia law Plaintiff has access to a full range of tort penalties. Plaintiff also points to 38 U.S.C. § 4302, a provision of USERRA that states that

> (a) Nothing in this chapter shall supersede, nullify or diminish any Federal or State law (including any local law or ordinance), contract, agreement, policy, plan, practice, or other matter that establishes a right or benefit that is more beneficial to, or is in addition to, a right or benefit provided for such person in this chapter.
> (b) This chapter supersedes any State law (including any local law or ordinance), contract, agreement, policy, plan, practice, or other matter that reduces, limits, or

> eliminates in any manner any right or benefit provided by this chapter, including the establishment of additional prerequisites to the exercise of any such right or the receipt of any such benefit.

Based on this provision, he accordingly, argues "[i]t could not be more clear that Congress intended that rights which existed to state law . . . were to be preserved." (Docket 103 at 18). In his response, Plaintiff also points the Court to *Reyes v. Goya of Puerto Rico*, 632 F. Supp. 2d 142 (D. P.R. 2009) and *Patton v. Target Corp.*, case no. 03-CV-1722-BR, 2007 Westlaw 894560, 2007 U.S. Dist. Lexis 20712 (D. Or. Mar. 21, 2007). In the latter case, the court held that the plaintiff could proceed on both a USERRA and a common law wrongful discharge claim after finding that the plaintiff's remedies under USERRA were inadequate. In *Reyes*, the court reached the same outcome on the plaintiff's emotional distress claim via a different analysis; it found that "nothing in the statutory language suggests that state tort law causes of action are pre-empted by USERRA. [The tort claim at issue] does not explicitly reduce, limit, or eliminate in any manner any right or benefit provided by USERRA. Furthermore, there is no indication in USERRA's legislative history that state law tort claims should be preempted by USERRA." *Reyes*, 632 F. Supp. 2d at 145.

Defendants counter in their reply to Plaintiff's response that these arguments of Plaintiff must fail. They point to the fact that, in *Guevara,* Chief Judge Haden considered the differences in remedies between West Virginia common law and the WVHRA, and that those differences did not impact his decision. Defendants also argue that Plaintiff incorrectly interprets 38 U.S.C. § 4302. They argue that the "right[s] or benefit[s]" referred to in Section 4302(a) are not additional common law remedies, as Plaintiff claims, but instead are "rights and benefits involving the terms and conditions of employment, not a right or benefit involving the remedies recoverable in a common law action. Therefore, the remedies for a common law claim are not 'rights and benefits' that would be

11

superseded by USERRA if Mills' public policy claim is dismissed because it is duplicative." (Docket 107 at 17). Defendants also attempt to distinguish *Patton* and *Reyes* by arguing that "they stand for the proposition that this Court should apply the state law of West Virginia consistent with *Guevara*. The *Reyes* case is also distinguishable from the instant action because in *Reyes*, the state law claims did not "hinge upon the same facts" as the plaintiff's USERRA claim." (Docket 107 at 17).

*C. Intentional Infliction of Emotional Distress*

Defendants argue that Plaintiff cannot show that they committed intentional infliction of emotional distress. They argue that Plaintiff has not presented evidence that Defendants engaged in outrageous conduct, acted with the intent to cause emotional distress or acted recklessly; and that the emotional distress that Plaintiff claimed to have suffered was so severe that no reasonable person could have been expected to endure it.

Plaintiff disagrees with the arguments of Defendants. He argues that West Virginia courts do not take the IIED standard literally, and pointing to *Philyaw v. Eastern Associated Coal Corp.*, 219 W. Va. 252 (2006) and *Bine v. Owens*, 208 W. Va. 679 2001), argues that inferences as to a defendant's behavior are allowable. He argues that there are two possible inferences from the facts in this case. The first is that Defendants violated USERRA and treated Plaintiff poorly, but did not act in a manner that, to cite *Travis*, was "atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency." The second possible inference, according to Plaintiff, "is that the Defendants set out to fire the Plaintiff in knowing violation of USERRA and then manipulated a layoff so as to hide that intent." (Docket 103 at 21). Under the latter inference, Plaintiff argues that he has "made his case" for IIED. *Id.* at 22.

*IV. DISCUSSION*

12

*A. USERRA*

The Court finds that Plaintiff has offered admissible evidence from which a reasonable juror could return a verdict in his favor. That evidence, combined with inferences that Plaintiff is entitled to by law, preclude Defendants' motion from being granted as to Plaintiff's USERRA claim.

*1. Plaintiff's National Guard Status as a Motivating Factor*

Plaintiff has presented sufficient evidence to show the existence of genuine issues of material fact as to his National Guard status being a motivating factor. On October 31st, Plaintiff states that Barry O'Bryan informed him that he was not to leave early or miss any more days of work, even if it involved the National Guard. This statement, if accepted as true, could be interpreted by the jury as an anti-military remark from a superior. Further, at his deposition, Plaintiff stated that Clay told him several times that they would have to replace Plaintiff because he would not be around. The Court disagrees with Defendants' argument that these statements should not be considered as anti-military remarks because doing so would be speculative. A jury should be permitted to draw reasonable inferences from these remarks, taking into consideration the totality of the circumstances.

Further, the Court finds that the public display of Plaintiff's National Guard training calendar, and O'Bryan's reaction to receiving it, are also evidence which could reasonably be interpreted as hostility or anti-military sentiment on the part of Defendants. While this may be circumstantial evidence, "circumstantial evidence will often be a factor in [USERRA] cases, for discrimination is seldom open or notorious." *Sheehan*, 240 F.3d at 1014.

The Court also finds that Plaintiff's October 31, 2006, meeting with O'Bryan is an adverse employment action. The Court disagrees with Defendants' contentions that this meeting was not an adverse employment action due to a lack of a temporal relationship and the fact that Plaintiff did not

13

suffer a change in employment status. The Court finds that this meeting could be interpreted as an adverse employment action if the jury believe it was arranged as a pretext to fire Plaintiff at some later point. Plaintiff is entitled to such an inference on summary judgment. Moreover, as this meeting occurred as plaintiff was enlisting in the National Guard, there is a temporal relationship between Plaintiff's enlistment and an adverse employment action. Thus, the Court finds that the Plaintiff has established genuine issues of material fact as to whether his military status was a motivating factor in the decisions to lay him off and to not rehire him.

*2. Would Plaintiff Have Been Laid Off Regardless of his National Guard Status?*

If the Plaintiff can prove that his military status was a motivating factor, Defendants have the burden of proving, by a preponderance of the evidence, that Plaintiff would have been laid off even if he had not been a member of the National Guard. The Court, again, finds that genuine issues of material fact exist on this issue.

As Plaintiff argued, a jury may determine that Defendants may have very well structured the lay off decision making process to ensure that Plaintiff would be selected. Plaintiff's job title had recently been changed to dryer operator and Plaintiff had low seniority and a record of poor performance. The performance record was discussed in Plaintiff's meeting with O'Bryan that was contemporaneous with his enlistment in the National Guard. Given this evidence and the inferences that Plaintiff is entitled to receive, genuine issues of material fact exist as to whether the decisions to lay off and not interview Plaintiff would have been made in the absence of Plaintiff's National Guard status. Therefore, the Court **ORDERS** that Defendant's motion for summary judgment as to the Plaintiff's USERRA claim be **DENIED**.

*B. West Virginia Public Policy*

The Court disagrees with Defendants, and finds that Plaintiff's claim under West Virginia public policy is not duplicative of his USERRA claim. Therefore, the Court denies the motion as to that claim. Despite Defendants' arguments to the contrary, the Court finds that the "rights or benefits" referred to in Section 4302 are not limited to those that involve the terms and conditions of employment. Rather, that term includes such "rights or benefits" as the right to other causes of action, such as Plaintiff's common law claim. Under Defendant's interpretation of Section 4302, a plaintiff would not have access to any other possible avenues for relief, thus rendering Section 4302(a) meaningless. The Court, therefore, finds that the clear language of Section 4302(a) protects Plaintiff's right to seek additional relief under common law. Therefore, the Court **ORDERS** that Defendant's motion for summary judgment as to the Plaintiff's public policy claim be **DENIED**.

*C. IIED*

The Court finds that summary judgement is appropriate as to the Plaintiff's IIED claim. The Court finds that, when Plaintiff is given the benefit of the inferences from the evidence to which he is entitled by law, a jury could conclude that Defendants acted outrageously in either an intentional or reckless manner. However, Plaintiff has presented absolutely no evidence to support the requirement that his emotional distress is or was so severe that no reasonable person could have been expected to endure it. Accordingly, the Court **ORDERS** Defendant's motion for summary judgment on Plaintiff's IIED claim be **GRANTED**.

*IV. CONCLUSION*

15

For the reasons stated above, the Court **ORDERS** Defendants' Motion for Summary Judgment [Docket 93] **DENIED** as to Plaintiff's **USERRA** and West Virginia public policy claims, and **GRANTED** as to Plaintiff's IIED claim.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: June 18, 2010

IRENE C. BERGER, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA